UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                      :
TONY D. PIACENTE,                                     :
                                                      :
                    Plaintiff,                        :
                                                      :
       - against -                                    :
                                                      :
INTERNATIONAL UNION OF BRICKLAYERS                    :
& ALLIED CRAFTWORKERS,                                :
INTERNATIONAL UNION OF BRICKLAYERS                    :     **OPINION & ORDER**
& ALLIED CRAFTWORKERS LOCAL #5 NEW                    :
YORK, MICHAEL J. CLIFFORD, individually               :     11 Civ. 1458 (ER)
and in his capacities as a member of                  :
INTERNATIONAL UNION OF BRICKLAYERS                    :
& ALLIED CRAFTWORKERS LOCAL #5                        :
NEW YORK and as a Trustee of the several funds        :
of Local 5 and MANUEL VALENTE, individually           :
and in his capacities as a member of the              :
INTERNATIONAL UNION OF BRICKLAYERS                    :
& ALLIED CRAFTWORKERS LOCAL #5                        :
NEW YORK and as a trustee of the several funds        :
of Local 5,                                           :
                                                      :
                    Defendants.                       :
                                                      :
------------------------------------------------------------x

RAMOS, D.J.:

     Plaintiff Tony D. Piacente ("Piacente," "Plaintiff," or "Counterclaim Defendant") brings

this action against Defendants under the Labor Management Reporting and Disclosure Act

("LMRDA"), 29 U.S.C. §§ 411 *et seq.* Defendant International Union of Bricklayers and Allied

Craftworkers moves for partial summary judgment with respect to Plaintiff's sole claim for

violation of Section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), relating to disciplinary

charges that were the subject of a union disciplinary hearing in January 2010. Doc. 31.

Defendants International Union of Bricklayers and Allied Craftworkers Local 5 New York,

Michael J. Clifford and Manuel Valente also move for partial summary judgment on the sole

count against them as well as with respect to their counterclaims against Plaintiff.  Doc. 27.  For the reasons set forth below, Defendants' motions are GRANTED in part and DENIED in part.

## I.      General Background[1]

At base, this case involves allegations that a former president of local labor union, Piacente, while in office, engaged in a small number of petty offenses, some of which allegedly injured the union and its affiliated funds financially to a relatively modest extent, and some of which amounted to sloppy or misguided accounting practices that did not injure the union or the funds financially, but that constituted violations of Piacente's fiduciary responsibilities to those entities.  Specifically, the financial improprieties concern:  (1) Piacente having allegedly purchased a computer worth approximately $500 for personal use with union funds; and (2) Piacente having taken money from the local union's two soda vending machines in an indeterminate amount.  Piacente specifically denies both allegations of financial impropriety.

The accounting irregularities concern:  (1) Piacente having improperly authorized an affiliated *fund* to pay a union member's salary for one week while he underwent *union* training; (2) Piacente improperly signing the name of another union official on approximately 25 checks for union expenditures; and (3) Piacente failing to adequately account for the proceeds of the union's soda vending machines.  Piacente is also alleged to have refused to return certain union documents after he was no longer president.

---

[1] Although this Opinion does not include a summary of all facts or references to all of the parties' arguments in connection with the instant motions, the Court has considered *all* of the legal arguments asserted by the parties and *all* of the relevant, material facts contained in the parties' submissions.

Citations to "Pl.'s 56.1 Resp. to IU" refer to Plaintiff's Response to Defendant IU's Local Rule 56.1 Statement of Undisputed Material Facts, Doc. 55, and to "Pl.'s 56.1 Resp. to Local 5" refer to Plaintiff's Response to Defendants Local 5, Clifford and Valente's Local Rule 56.1 Statement of Undisputed Material Facts, Doc. 56.  "Clifford Decl." refers to the Declaration of Michael Clifford J. Clifford in Support of Defendants' Motions for Summary Judgment, Doc. 36.

2

Piacente admits to having authorized the fund to pay for the member's union training but asserts that it was done with the knowledge of the leadership of the fund and the union and that, in any event, the member was entitled to be paid for his time in training.  Piacente also admits to signing another official's name on approximately 25 checks, but asserts that it was done with that official's consent and that such a practice was "common" in the union because of convenience.  In any event, there is no allegation that the 25 checks were used for an improper purpose.  Finally, Piacente asserts that he adequately accounted for the vending machine proceeds.

Aggrieved that he was made to respond to such allegedly "bogus" charges, Piacente asserts that the charges against him were the result of personal animus against him by the defendants and brought suit alleging that the manner in which the charges were prosecuted violated his due process rights.  Apparently aggrieved that Piacente sued them, three defendants brought counterclaims against him for breach of fiduciary duty in violation of federal law and state law, conversion and replevin.

  a.  **The Parties**

Defendant International Union of Bricklayers and Allied Craftworkers ("IU") is a labor organization within the meaning of Section 102(I) of the LMRDA, 29 U.S.C. § 402(I).  Pl.'s Resp. 56.1 to IU ¶ 2.  Defendant International Union of Bricklayers and Allied Craftworkers Local 5 New York ("Local 5") is also a labor organization under the LMRDA.  *Id.* ¶ 1.  The Bricklayers and Allied Craftworkers Local 5 New York Apprentice Training and Journeymen Upgrading Fund (the "Fund")[2] is a collectively bargained apprenticeship fund of Local 5.  *Id.* ¶ 4.

---

[2] In their Memorandum of Law, Defendants note that the Fund has been referred to in the pleadings by other names, including the "Joint Apprenticeship and Journeyman Upgrading Fund," Compl. ¶ 15; the "JATC, *id.*; and the "Local

Plaintiff Tony Piacente has been a member of Local 5 since August 1983.  *Id.* ¶ 5.

Plaintiff served as the President of Local 5 from July 9, 2001 through August 31, 2008.  *Id.* ¶ 6.

As an officer of Local 5, Plaintiff admits that he was also a fiduciary of Local 5.  *Id.* ¶ 8.  Until

August 31, 2008, Plaintiff served as a Trustee on the Fund's Board of Trustees, "had discretion

with respect to the operation of the Fund, with others had control over Fund assets, and was a

fiduciary with respect to the Fund within the meaning of the Employment Retirement Insurance

Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461."  *Id.* ¶ 9.

Defendant Michael J. Clifford ("Clifford") has at all times relevant to this lawsuit been a

member, officer and employee of Local 5.  Clifford became Local 5's Secretary-Treasurer in late

2008 and has served on the Fund's Board of Trustees since approximately August 2008.  *Id.* ¶

17.  Defendant Manuel Valente ("Valente") has at all times relevant to this suit been a member,

employee and officer of Local 5.  Valente has served as President of Local 5 since October 14,

2008, and at all times relevant to this suit has also been a Trustee of the Fund.  *Id.* ¶¶ 7, 11;

Clifford Decl. ¶ 7.

### b.  **Fund Trust Agreement**

Plaintiff was one of the signatories of the Fund's Trust Agreement ("Trust Agreement"),

dated May 1, 2007.  Pl.'s Resp. 56.1 to IU ¶ 10.  Pursuant to Article III, Section 7 of the Trust

Agreement:

> [A]ll checks, drafts, vouchers, or other withdrawals of funds from the accounts or
> account of the Trust Estate shall be signed by one *Employer Trustee and one*
> *Union Trustee*.  The Trustees may designate, in writing, two or more Trustees to
> sign said withdrawals provided that any two such designated Trustees who
> actually sign checks are not both members of the Employers or Union group.  The

---

5 Joint Apprenticeship and Training Committee."  Counterclaims ¶ 8.  According to Defendants, all of these names
refer to the "Fund," and Plaintiff does not dispute this account.  IU Mem. 2 n.1, Doc. 32..

> Trustees may by resolution authorize the Fund Manager and/or Agent or other Employees of the Fund to be the sole signatory on checks drawn on an office account.

Clifford Decl., Ex. O ("Trust Agreement") (emphasis added).

### c. **Simmons Check**

William Simmons ("Simmons"), a member of Local 5 and a personal friend of Plaintiff, was sent by Plaintiff to attend the IU New Leaders Conference in Silver Spring, Maryland during the week ending April 25, 2008.  Pl.'s Resp. 56.1 to Local 5 ¶ 12; Clifford Aff., Ex. G (Plaintiff's Response to Defendants' Notice to Admit ("Notice to Admit")), Q. 32.  Plaintiff had previously advised the Local 5 Management Committee that he would be sending Simmons to the New Leaders Conference.  The purpose of the New Leaders Program, which is for new Local 5 leaders, is to equip new union officers and field representatives with the necessary skills to perform their jobs, and to provide a full understanding of the resources available through the IU. *Id.* ¶ 13.[3]  Plaintiff did not ask the Fund Trustees for approval to pay Simmons for the time he attended the New Leaders Conference.  *Id.* ¶ 14.

At some point afterwards, Plaintiff directed Brian Haley ("Haley"), then supervisor of renovations of the Fund headquarters, to prepare a timesheet for Simmons reflecting 40 "regular

---

[3] In his Response to Local 5's 56.1 Statement of Undisputed Material Facts discussing that Plaintiff had advised the Local 5 Management Committee of Simmons' attendance at the New Leader Program, Plaintiff states:  "Admits subject to the following statement:  In the past, other Members of Local 5 who had been sent to the New Leader Program had been paid for the time that they spent there . . . Clifford had expected that Simmons would be paid for his time at Leadership Training School."  Pl.'s Resp. 56.1 to Local 5 ¶ 13.  In other instances, Plaintiff neither admits nor denies a particular fact, but instead responds with equivocal statements such as:  "Admit but see . . . ." *Id.* ¶ 14, 17.  "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011); *see also Costello*, 783 F. Supp. 2d at 661 n.5 (disregarding plaintiff's responses where plaintiff failed to specifically dispute defendant's statements); *Buckman v. Calyon Secs.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted"); *Geoghan v. Long Island R.R.*, 06 Civ. 1435 (CLP), 2009 WL 982451, at *5-6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").

hours" completed for the week ending April 25, 2008 and to submit the timesheet to the Fund administrator for payment. *Id.* ¶¶ 11, 15; Clifford Aff, Ex. M.  However, Simmons did not perform any renovation work at the Fund headquarters that week as he had been at the New Leaders Conference. *Id.* ¶ 12.

On May 1, 2008, Plaintiff signed a payroll check for Simmons from a Fund account for $957.53 for the pay period April 19 – April 25, 2008, when Simmons was out of town at the IU New Leaders Conference (the "Simmons Check"). *Id.* ¶ 16; Notice to Admit, Q. 36; Clifford Aff., Ex. M.  The signatures on the Simmons Check are of "Tony Piacente" and "Manny Valente;" however, Plaintiff admits that in addition to signing his own name, he also signed for "Manny Valente."  Pl.'s Resp. 56.1 to Local 5 ¶ 17.

### d.  **25 Additional Checks**

Plaintiff signed twenty-five (25) additional checks from the Fund account with his own name and with a second signature reading "Manny Valente" (the "25 Checks"). *Id.* ¶ 18.  There is no dispute that Piacente, and not Valente, signed Valente's name on these 25 checks. *Id.* ¶ 19.

### e.  **Vending Machine**

Local 5 owned soda vending machines at its offices in Poughkeepsie and Newburgh, New York. *Id.* ¶ 29.  Defendants allege that Plaintiff removed cash from each machine, and rely on Plaintiff's deposition testimony.  Clifford Decl., Ex. L (Piacente EBT) 70.  Plaintiff admits that he took cash from the machines but alleges that he only removed cash from the Poughkeepsie machine, and that this money was used solely to purchase soda to restock the machine.  Pl.'s 56.1 2 ¶ 29 (citing P's EBT 70).  Plaintiff further alleges that others also had access to the machine. *Id.* (citing EBT 73).  Plaintiff claims that there were two keys to the

machine, Clifford Decl., Ex. G, Q. 46, and concedes that he did not keep track of the amount of money that he removed from the machine.  Pl.'s 56.1 2 ¶ 31

### f.   **Plaintiff's Termination & Local 5's Request for Return of Property**

During Plaintiff's tenure, some of Local 5 and its related ERISA Trust Funds records were delivered directly to Plaintiff's home.  Pl.'s Resp. 56.1 to Local 5 ¶ 32.  By letter sent on August 22, 2008, Local 5 demanded that Plaintiff return "all properties" belonging to Local 5 and all of its related Funds by August 29.  Plaintiff received the letter on August 25.  Clifford Aff., Ex. R.  By letter dated August 28, 2008, Local 5 advised Plaintiff that as of September 1, he would no longer hold any position with respect to Local 5 or its related trust funds.  Pl.'s Resp. 56.1 to Local 5 ¶ 34; Clifford Aff., Ex. S.  Then, by letter dated September 4, Local 5 sent Plaintiff a letter discussing his termination and referencing the August 22 letter requesting return of "all properties" belonging to Local 5 and its related Funds.  Clifford Aff., Ex. T.

Defendants allege that during discovery, Plaintiff produced a number of Local 5 and related trust fund documents and files, including electronic records.  Local 5's 56.1 Stmt. ¶ 36, Doc. 29.  Plaintiff disputes this characterization and states that most of the documents produced were "copies" of documents that had been sent or given to him in the "regular course" of his business as a Trustee of the Funds or as President of Local 5.  Pl.'s Resp. 56.1 to Local 5 ¶ 36; Piacente Aff. ¶ 16-19, 30-31, Doc. 54; Piacente Aff., Ex. 5.  Some of the addresses on the documents retained by Plaintiff correspond to his home address.  Pl.'s Resp. 56.1 to Local 5 ¶ 37.  Plaintiff admits that he did produce electronic records which had been given to him by one of the accountants working on behalf of Local 5 and/or the Funds."  *Id.* ¶ 36.

On September 4, Valente signed a property return checklist for items returned by Plaintiff.  Clifford Aff., Ex. P.  The categories on the checklist include items such as car, car keys, garage door opener, office keys, computer, cell phone, and Local 5 and related Funds apparel.  *Id*.  As noted by Plaintiff, the checklist does not contain a box or column for paperwork or files.  Piacente Aff. ¶ 31.

### g.  **Charges Against Plaintiff and the Disciplinary Hearing**

By certified letter postmarked on June 18, 2009, Defendant Clifford filed charges alleging misconduct by Plaintiff (the "June 18 Charges") with the Executive Board of Defendant IU, under the internal disciplinary system established by Code 6 of the IU Constitution.  Pl.'s Resp. 56.1 to Local 5 ¶ 38.  The June 18 Charges alleged that Plaintiff signed the Simmons Check from the Fund's checking account for work allegedly performed for the Fund during a time when Simmons was out of town at leadership training.  *Id*. ¶ 39.  The charges also alleged, *inter alia*, that the Simmons Check contained Plaintiff's signature and a signature purporting to be that of Defendant Valente, and that Clifford recognized the second signature as not belonging to Valente.  Clifford Decl., Ex. M ("June 18 Charges").

According to Code 6, Section 1.C.(2) of the IU Constitution, charges against a present or former officer of the local union of which the charging party is a member may be filed with the IU Executive Board if the charges relate to conduct while in office and would merit removal or barring from office.  *Id*. 40.  The June 18 Charges were received by the IU on approximately June 25, 2009.  Notice to Admit, Q. 16.

On September 23, 2009, then-IU Secretary-Treasurer James Boland ("Boland") sent a letter to Plaintiff notifying him of the June 18 Charges, which were enclosed with the letter, and

informing him that John Wurtenberg, IU Regional Representative for the Northeast Region, had been assigned to investigate those charges.  Pl.'s Resp. 56.1 to IU ¶ 19.  Plaintiff received Boland's letter on September 25; however, Plaintiff had previously received a copy of the charges.  *Id*. ¶ 20.

By letter dated December 14, Boland sent Plaintiff a letter enclosing an Order of the IU Executive Board, also dated December 14, notifying Plaintiff that the June 18 Charges would be set for a hearing along with additional allegations that had arisen out of an investigation into the June 18 Charges ("December 14 Charges").  *Id*. ¶ 21;Boland Aff., Ex. 4 (December 14 Charges). In particular, the December 14 Charges alleged that (1) then-Local 5-Secretary-Treasurer Valente's signature was falsified on more than 25 checks with a total value of $21,000; (2) that monies were appropriated from a vending machine in the Local 5 union hall; (3) that Plaintiff purchased property for the Local, but did not return it after he lost the 2008 election to Andrew Gallante; and (4) that there were inappropriate charges made on a Local 5 credit card.  Boland Decl., Ex. 4.  The December 14 Charges further noted that the charging parties had to present evidence at the hearing which would be subject to cross-examination and that Plaintiff was entitled to present a defense through documentary evidence and testimony.  *Id*.

In addition, Boland's December 14 letter notified Plaintiff of the time and place of the hearing on the disciplinary charges, initially scheduled for January 21, 2010, and informed Plaintiff of his rights to "present in your defense whatever evidence, documents and testimony from yourself or other witnesses you might wish," and to "have a representative to assist you." Pl.'s Resp. 56.1 to IU ¶¶ 25-26.  Boland's letter further informed Plaintiff that the IU would arrange to have a court reporter present at the hearing, which would be presided over by IU

Representative Craig Strucwick, and that the determination on the charges would be made by the IU Executive Board based on the complete record, including the transcript of the hearing.  *Id*. ¶ 27.  Plaintiff requested an adjournment of the hearing, which was granted, and the hearing was rescheduled to January 28, 2010.  *Id*. ¶ 29.

On January 28, 2010 the IU Executive Board conducted the hearing on the June 18 and December 14 Charges.  *Id*. ¶ 31.  Clifford presented the charging party's case at the hearing.  *Id*. ¶ 33.  Plaintiff attended the hearing, questioned the charging party's witnesses, made statements on his own behalf, and called witnesses in his defense.  *Id*. ¶ 34; Piacente Dep. 16:11-22, 23:10-24:9.  The Court notes that although Plaintiff made statements on his own behalf, these statements were made in the form of narratives while questioning witnesses, and Plaintiff did not formally testify in his own defense.  *See generally* Clifford Aff., Ex. Q ("January 28 Hearing Testimony").

### h.  **IU Executive Board Decision**

By decision dated July 6, 2010 (the "July 6 Decision"), the IU Executive Board found Plaintiff guilty on three of the four charges tried (the Simmons Check, the vending machine and the computer charges) and imposed punishment on those three charges, but declined to rule on the fourth charge (the 25 checks bearing the purportedly forged Valente's signature).  Defs.' Notice to Admit, Ex. I.

Before discussing the merits of the charges against Plaintiff, the IU Executive Board addressed Plaintiff's defenses.  First, Plaintiff had asserted that the charges were untimely.  However, the Executive Board explained that to be timely, charges had to be filed within thirty (30) days after the alleged offense occurred, of if later, when the offense was discovered.  Since

"[t]here is no evidence undermining Brother Clifford's claim that he first knew of the alleged offense on or after May 20," the charges filed on June 13 were timely.  *Id*. at 2-3.

Second, Plaintiff had alleged that the charges were not sufficiently detailed as to IU Constitution Code 5, Section 1(T) because a specific provision of the IU Constitution was not identified.[4]  The Executive Board rejected this argument and found that the June 18 Charges specifically quoted the language of Section 1(T), and stated that it pertained to a violation of Code 5 of the IU Constitution.  The IU Executive Board also noted that the charges "also cite specific provisions of Code 5, namely, Section 1, Paragraphs B, G, M, and S."  *Id*. at 3.

### i.  The Simmons Check

On the Simmons check charge, the Executive Board found that Simmons was paid for a week by the Fund for time that he spent at the New Leaders Conference and Plaintiff directed Simmons to ask Haley, the supervisor of the Fund renovation project, to submit a timesheet for one week's pay for the training time.  "The clear import of arranging for pay in that manner is that the pay would not come from the Local Union but rather from the [Fund], and would appear to be for work on the office and training center renovation."  *Id*. at 5.

The Executive Board also addressed Plaintiff's claim that it was proper to use the Fund assets to pay for Simmons' training and stated that this defense "might have been persuasive had it been open and notorious, but here it was done in a manner to ensure secrecy."  *Id*. Specifically, the Executive Board noted:

---

[4] The IU Constitution states that all charges "must state the provision of the Code of International Offenses, or of the I.U. Constitution or laws of an affiliate, allegedly involved.  If the provision relied upon is Section 1, subsection T of the Code of International Offenses, the charge shall specify the Section of the IU Constitution or the law or order promulgated thereunder allegedly violated.  The charge shall also state the specific action of the charged party complained of, the number of times the action occurred, and the date of each action specified."  Clifford Decl., Ex. A (Code 6.1.A).  Code 5, Section 1(T) of the IU Constitution states:  "For any member or affiliate knowingly to violate, or to conspire or attempt to violate, the Constitution of the International, any laws promulgated thereunder, or any lawful order of the IU Executive Board."  *Id*.

11

> Rather than getting authorization from the Board of Trustees to proceed in that
> manner, Brother Piacente proceeded in a manner that all but ensured that it would
> never be examined by the Trustees.  Rather than submitting a timesheet himself,
> he directed the supervisor of the renovation project to do it, thus hiding the
> timesheet in plain sight by including it with dozens of other, presumably
> legitimate timesheets.  Moreover, rather than signing the check alone – he himself
> claims only one signature was needed on a payroll check . . .  – the check is
> forged to contain a second signature.  Brother Piacente not only does not deny
> that he forged brother Valente's signature, but defends himself on the basis that it
> was common practice.

*Id*.  The Executive Board found that Plaintiff's actions with respect to the Simmons Check

violated Code 5, Section 1(B) because he falsified and withheld information about what should

have been an IU expenditure, and that should have been part of the IU's financial recordkeeping.

Plaintiff's actions also violated Code 5, Section 1(M) because in deferring the expense onto the

Fund, which is an ERISA Fund, he placed the IU in the position of potentially accepting a

benefit from the Fund under circumstances that could amount to a prohibited transaction, thus

interfering with the legal obligations of Local 5.  *Id*.

> Furthermore, the Executive Board stated:

> Such transactions are to be scrupulously avoided.  Recognizing and respecting the
> separation between [U]nion and ERISA fund finances is a very serious
> responsibility of union officers, and one that is repeatedly stressed by the
> International Union.  Brother Piacente's actions were seriously detrimental to the
> [IU], and therefore violate Section 1(S), because they had potential to bring harm
> and disrepute to an affiliate of the International.  By virtue of each of the
> foregoing violations, Brother Piacente also violated Section 1(T).

*Id*.  Accordingly, the IU Executive Board fined Plaintiff $2,000 and barred him from seeking or

holding union office or position for five (5) years.  *Id*.

### ii.  Vending Machine

The Executive Board explained that Clifford had presented evidence that Local 5 spent

$1,700 on soft drinks during a four-year period in which only $65 in proceeds was deposited and

that during this time, Plaintiff had the only key to the machine and the machine was under his exclusive control.  In his defense, Plaintiff argued that some of the soda was used for other purposes, that the machine was sometimes left unlocked, that he did not have sole access to the machine, and that others might have stolen money from the machine.  The Executive Board noted that such statements by Plaintiff were the product of his "argument[s]" during the questioning of witnesses and was not testimony subject to cross-examination.  *Id*. at 6.

The IU Executive Board found that the prosecution presented "sufficient" circumstantial evidence to demonstrate a large gap in soda purchases and vending machine receipts.  Further, as principal officer during the relevant period, Plaintiff should have tracked the inventory of soda. In light of the "large shortfall," Plaintiff's "utter failure" to track the inventory of the soda violated Code 5, Section 1(B) (withholding information required to be reported).  The Board also found that the exclusive control of the vending machine and the shortfall, "with no denial and only vague claims to other uses," supports a finding of a violation of Code 5, Section 1(G) (conversion of property, either the soda or the cash, to one's personal use).

On this charge, the Board did not impose a fine, but it barred Plaintiff from seeking or holding union office or position for five (5) years, to run concurrently with the 5-year ban imposed on the Simmons check charge.  *Id*. at 6-7.

### iii.   The 25 Additional Checks

Finally, the Executive Board discussed that at the hearing, the prosecution presented 25 additional Fund checks with allegedly forged signatures.  Plaintiff neither confirmed nor denied having signed Valente's name on the checks, however, according to the Executive Board, Plaintiff's defense that it was "common practice" to sign Valente's name on payroll checks,

suggested that Plaintiff was conceding that he had forged Valente's signature.  The Executive Board further noted that there was no allegation that the checks were signed for improper expenditures; however, the Executive Board did not condone forging signatures.  Accordingly, since "the remedy for this offense would be to bar the charged party from office" and "[b]ecause that remedy is fully supported by the violations above, nothing would be served by 'piling on' through this charge, and we therefore decline to rule on this charge."  *Id.* at 8.

    i.   **Procedural History**

Plaintiff commenced this action on March 3, 2011 asserting only one cause of action, split into two counts, the first for injunctive relief and the second for money damages.  Compl. ¶¶ 42-63.  Plaintiff alleges that he was "fined" and "otherwise disciplined" by the IU Executive Board's July 6, 2010 decision in violation of his due process rights under the LMRDA Section 101(a)(5), 29 U.S.C. § 411(a)(5), and that he disciplined without a basis of "some evidence" of guilt in the record.  *Id.*

On March 4, Plaintiff filed an Order to Show Cause.  Doc. 20.  That same day, Judge Cathy Siebel held a Show Cause hearing and denied Plaintiff's request for injunctive relief. Clifford Decl., Ex. C.   Subsequently on August 15, 2011, Defendants served an Answer and Counterclaims on Plaintiff.  Doc. 15.  Specifically, Defendants Clifford and Valente asserted counterclaims for breach of fiduciary duty in violation of ERISA §§ 404(a)(1) and 406(a)-(b) (First and Second Counterclaims), and Defendant Local 5 asserted counterclaims for breach of fiduciary duty in violation the LMRDA (Third Counterclaim); breach of fiduciary duty under New York common law (Fourth Counterclaim); replevin (Fifth Counterclaim); and conversion (Sixth Counterclaim).   On January 6, 2012, the case was reassigned to the undersigned.  Doc.

121.  On February 10, Defendants served a Notice to Admit on Plaintiff pursuant to Federal

Rules of Civil Procedure 36, Clifford Decl., Ex. F, and Plaintiff served his Responses to

Defendants' Notice to Admit ("Pl.'s Resp. Not. to Admit") on March 12.  *Id.*, Ex. G (*see also id.*,

Exs. I, K).  On April 16, Defendants' attorneys deposed Plaintiff ("Piacente Dep.").  *Id.*, Ex. L.

On April 30, Defendants Local 5, Clifford and Valente moved for summary judgment on

the two counts against them as well as with respect to their six counterclaims against Plaintiff.

Doc. 27 ("Local 5 Mem.").  That same day, Defendant IU moved for partial summary judgment

with respect to Plaintiff's sole claim.  Doc. 31 ("IU Mem.").  The Court notes that both sets of

Defendants are not moving for summary judgment as to Plaintiff's claims regarding the

computer charge, and accordingly, the computer charge remains for trial.  IU's Mem. 5, Doc. 32;

Local 5's Reply Mem. 8 n.13, Doc. 58.  On January 4, 2013, the Court granted Plaintiff's

counsel request to withdraw their representation of Plaintiff.  Doc. 62.  Plaintiff is currently *pro

se*, Doc. 62; however, he was represented by counsel during discovery and during the preparation

of papers for summary judgment.

## II.    Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the evidence is such that a

reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free

Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v.

Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the

outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### III.     Defendant IU's Motion for Partial Summary Judgment

Defendant IU has moved for partial summary judgment on Plaintiff's sole claim (as

stated in his two causes of action) for violation of Section 101(a)(5) of the LMRDA, 29 U.S.C. §
411(a)(5).  IU seeks summary judgment on three of the four disciplinary charges that were
considered at the January 28, 2010 hearing and the IU Executive Board's July 6, 2010 decision:
the Simmons Check charge, the 25 additional checks charge and the vending machine charge.
IU does not seek summary judgment on the computer charge due to anticipated factual disputes.
IU's Mem. L. 5.

    **a.  Background on the LMRDA**

The LMRDA was enacted "to correct widespread abuses of power and instances of
corruption by union officials," *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO
v. Pelella*, 350 F.3d 73, 83 (2d Cir. 2003) (quoting *Franza v. Int'l Brotherhood of Teamsters,
Local 671,* 869 F.2d 41, 44 (2d Cir. 1989)) (internal quotation marks omitted), and represents
Congress' intent to prevent union officials form abusing their disciplinary authority.  *Id.* (citation
omitted).

Section 101(a)(5) of the LMRDA, which addresses safeguards against improper
disciplinary action, provides:

> No member of any labor organization may be fined, suspended, expelled, or
> otherwise disciplined except for nonpayment of dues by such organization or by
> any officer thereof unless such member has been (A) served with written specific
> charges; (B) given a reasonable time to prepare his defense; (C) afforded a full
> and fair hearing.

29 U.S.C. § 411(a)(5).  The Second Circuit has explained that Section 101(a)(5) was "not
intended by Congress to constitute an invitation to the courts to intervene at will in the affairs of
unions," *Georgopoulos v. Int'l Bhd. of Teamsters, AFL-CIO*, 942 F. Supp. 883, 894-95
(S.D.N.Y. 1996), *aff'd*, 116 F.3d 1472 (2d Cir. 1997) (quoting *Gurton v. Arons,* 339 F.2d 371,

375 (2d Cir. 1964)) (internal quotation marks omitted), but instead to "guard against abusive and unjust exercises of union authority by prohibiting a union from disciplining a member without first affording him certain procedural safeguards against unwarranted or inaccurate adjudication." *Id*. at 895 (quoting *Rosario v. Amalgamated Ladies' Garment Cutters Union,* 605 F.2d 1228, 1238 (2d Cir. 1979)) (internal quotation marks omitted).  Congress "believed that only essential standards should be imposed by legislation, and that in establishing those standards, great care should be taken not to undermine union self-government," *United Steelworkers v. Sadlowski,* 457 U.S. 102, 117, *reh'g denied,* 459 U.S. 899 (1982), and therefore "courts are not to intrude upon internal union disciplinary actions except to uphold these minimum standards." *Georgopoulos,* 942 F. Supp. at 894-95 (citing *Int'l Broth. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman,* 401 U.S. 233, 242–44 (1971)).

Union disciplinary proceedings are not judicial proceedings, and accordingly, the full panoply of procedural protections afforded in such proceedings is not required.  *Id*. (citing *United States v. Int'l Bhd. of Teamsters,* 964 F.2d 1308, 1312–13 (2d Cir. 1992) (upholding admission of hearsay in union disciplinary hearing); *United States v. Int'l Bhd. of Teamsters,* 870 F. Supp. 557, 560–61 (S.D.N.Y. 1994) ("Constitutional due process does not require a that union member has the power to subpoena witnesses to appear at a union disciplinary hearing"); *Feltington v. Moving Pictures Mach. Operators' Union,* 77 Civ. 4417, 1977 WL 1807, at *5 (S.D.N.Y. Dec. 5, 1977) ("'full and fair hearing' requirement for union disciplinary actions does not include the full panoply of safeguards guaranteed to criminal defendants.")).

A union member subject to internal disciplinary proceedings is entitled to "an impartial trial body which arrives at its decision on the basis of evidence that the accused has an opportunity to rebut." *Id.* (citing *Berg v. Watson,* 75 Civ. 1644, 1977 WL 1728, at *3 (S.D.N.Y. Aug. 24, 1977)).  The accused must be given "adequate notice and a reasonable opportunity to defend, including the right to confront an accuser, to present evidence and to cross-examine witnesses." *Id.* (citation and internal quotation marks omitted).  However, the burden of proof is low; the charging party must provide only "some evidence" at the disciplinary hearing to support the charges.  *Id.* (citing *Hardeman,* 401 U.S. at 234).  Notably, "a union's reasonable interpretation of the scope of offenses for which it may discipline its members is entitled to deference." *Id.* (citing *Hardeman,* 401 U.S. at 244-45; *Int'l Bhd. of Teamsters v. Local Union 810,* 19 F.3d 786, 788, 793 (2d Cir. 1994)).  Thus, it is not the court's obligation to interpret union rules "in order to determine whether particular conduct falls within or without their scope," or "to scrutinize the union regulations in order to determine whether particular conduct may be punished at all."  *Hardeman,* 401 U.S. at 244-45.

Furthermore, even where a union fails to abide by its own procedural rules, there is no LMRDA violation unless the failure also "contravenes specific prohibitions in the LMRDA." *DeCarlo v. Salamone*, 977 F. Supp. 617, 625 (W.D.N.Y. 1997) (quoting *Wellman v. Int'l Union of Operating Eng'rs,* 812 F.2d 1204, 1206 (9th Cir. 1987)) (internal quotation marks omitted). "The LMRDA does not allow the recovery of damages for a union's violation of a technical internal rule that does not adversely affect a member's due process rights." *Id.* (quoting *Wellman,* 812 F.2d at 1206).

### b.  Simmons Check Charge

As an initial matter, Plaintiff argues that his due process rights were violated because the June 18 Simmons Check charge was untimely.  Pl.'s Opp. Mem. 3-6.  It is undisputed that the Check Charge was mailed by Clifford on June 18, 2009 and was received by the IU on June 25.  According to the IU Constitution, charges must be brought against a member within thirty days of an alleged offense or, if later, its discovery.  Clifford Aff., Ex. A, Code 6, Section 1(A). Plaintiff claims that although it is not in dispute that Clifford mailed the charges within thirty days of discovery of the alleged misconduct, the IU did not receive the charges until more than thirty days after discovery.  Pl.'s Opp. Mem. L. 4.  He further argues that the IU Constitution does not define whether the date of mailing or the date of receipt by IU constitutes the date upon which charges are deemed to be filed.  *Id.*  Plaintiff is mistaken.  Code 6 of the IU Constitution defines the term "filed" as the date of mailing.  Code 6, Section 5(A) provides:  "Whenever notice or filing by a certain date is required by this Code, mailing of the document required, correctly addressed, by that date shall constitute compliance . . . ."  Clifford Aff., Ex. A, Code 6, Section 5(A).  As noted by IU, since Plaintiff admits that the Simmons check charge was mailed on June 18, 2009, and since it was "correctly addressed," Plaintiff's timeliness argument fails. Accordingly, Plaintiff's timeliness argument is without merit.[5]

---

[5] Plaintiff also alleges that the December 14 charges were also untimely filed since they were issued more than six months after discovery.  Pl.'s Opp. Mem. 6.  As discussed below, the Court need not discuss Plaintiff's procedural arguments regarding the December 14 Charges.  However, the Court notes that "[t]echnical violations of a union's internal procedural rules are not cognizable under the LMRDA."  *Green v. Brigham*, 03 Civ. 5190 (JG), 2005 WL 280327, at *5 (E.D.N.Y. Feb. 3, 2005) (citing *United States v. Int'l Bhd of Teamsters*, 247 F.3d 370, 385, 387 (2d Cir. 2001) (finding no violation of the LMRDA where union fails to follow its own procedural rules, unless that failure deprives the party of a full and fair hearing).  In *Green*, the court dismissed plaintiffs' claims that charges were not presented within two weeks of when the charging party knew or should have known of the facts underlying the charge, as required by the union constitution and bylaws.

IU seeks summary judgment on the Simmons Check charge on the basis that Plaintiff received all procedural protections required until Section 101(a)(5).  Plaintiff in opposition only contests that that the Simmons check charge was sufficiently specific or that he was afforded a fair hearing.  Pl.'s Opp. Mem. 6-9.  Plaintiff, however, does not contest IU's argument that he was afforded a reasonable amount of time to prepare his defense to the Simmons Check charge and that the IU's decision on that charge was supported by "some evidence."  *See* IU's Mem. 12-13, 17-22; Pl.'s Opp. Mem. 2-11; IU's Reply Mem. 1.

    a.  <u>Specificity of the June 18 Charges</u>

The first requirement for discipline under LMRDA Section 101(a)(5) is that the charged party must be "served with written specific charges."  29 U.S.C. § 411(a)(5)(A).  Plaintiff alleges that the June 18 Charge violated this provision because the charge did not "with reasonable particularity, indicate the time and place of the alleged offense, the nature of the charges, any witnesses to the offenses, or that Mr. Piacente actually committed any of the acts that 'troubled' Clifford or made him 'suspicious' . . . other than to say, correctly, that his signature appeared on the Simmons check."  Pl.'s Opp. Mem. 6-7.  Plaintiff's arguments are without merit.

The Supreme Court has interpreted the "specific charges" provision of Section 101(a)(5) to require only that the charges are "specific enough to inform the accused member of the offense that he (or she) has allegedly committed."  *Hardeman*, 401 U.S.at 245 (quoting comments of Senator McClellan, Labor–Management Reform Legislation, Hearings before a Joint Subcommittee of the House Committee of Education & Labor, 86th Cong., 1st Sess., pt. 5 p. 2285 (1959)) (internal quotation marks omitted).  This standard does not require reference to a specific provision of a union's constitution or by-laws as the Supreme Court in *Hardeman* noted

that "a union may discipline its members for offenses not proscribed by written rules at all . . . ." 401 U.S. at 244-45; *see also Kuehne v. Local No. 1 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S & Canada*, 09 Civ. 1974 (RJD) (VVP), 2012 WL 3257949, at *4 (E.D.N.Y. Aug. 8, 2012) (citing *Hardeman*, 401 U.S. 224).

Furthermore, the "degree of specificity required to meet the statutory standard will vary from case to case and clearly, the strict requirements of a criminal prosecution need not be complied with." *Berg v. Watson*, 417 F. Supp. 806, 810 (S.D.N.Y. 1976) (collecting cases). "Union officials cannot be expected to frame their charges and specifications technically as formal legal pleadings." *Gleason v. Chain Serv. Rest.*, 300 F. Supp. 1241, 1251 (S.D.N.Y. 1969), *aff'd*, 422 F.2d 342 (2d Cir. 1970) (quoting *Jacques v. Local 1418, Int'l Longshoremen's Ass'n*, 246 F. Supp. 857, 859 (E.D. La. 1965), *aff'd*, 404 F.2d 703 (5th Cir. 1969)) (internal quotation marks omitted); *accord Johnson v. Nat'l Ass'n of Letter Carriers Branch 1100*, 182 F.3d 1071, 1074 (9th Cir. 1999) ("This is not to say . . . that we hold union members to the standards required of a practicing attorney by requiring a highly technical statement of the facts.").  Therefore, the required level of specificity "does not rise to the level needed for a criminal indictment," *Johnson*, 182 F.3d at 1074 (citing *United States v. IBT*, 19 F.3d 816, 823 (2d Cir. 1994)), and instead, "an informal written statement of facts suffices." *Id*. at 1075.

However, the "notice must be so drafted as to inform a member with reasonable particularity of the details of the charges," *Gleason*, 300 F. Supp. 1251 (citation and internal quotation marks omitted), and "[a]t a minimum, the accused should be informed of the nature of the offense, the circumstances surrounding the alleged infraction and, as nearly as may reasonably be ascertained, the time and place of the occurrence." *Berg*, 417 F. Supp. at 810

22

(citing *Gleason*, 300 F. Supp. at 1251); *accord Magelssen v. Local Union No. 518, Operative Plasterers' & Cement Masons' Int'l Ass'n,* 233 F.Supp. 459, 461 (W.D. Mo. 1964) (noting that "[n]o technical formalities should be imposed . . . but some factual assertion, no matter how informal, is necessary to allow an accused member to prepare his defense."); *id*. at 461 n.1 (explaining that Congress rejected a bill that would have required inclusion in the charge of "the time, place, specific nature of, and facts comprising the alleged offense, and citation of the rule alleged to be violated.").  Moreover, to proceed on a claim that the written charges were deficient and violated the LMRDA, the disciplined union "member must demonstrate that he was misled or otherwise prejudiced in the presentation of his defense." *Frye v. United Steelworkers of Am.,* 767 F.2d 1216, 1223 (7th Cir. 1985) (citing *Hardeman,* 401 U.S. at 245).

### i.   Contents of June 18 Charges

Here, the June 18 Charges set forth a statement of facts that provided Plaintiff with sufficient information to present a defense.  In the charge, Clifford explained that on May 20, 2009, he was reviewing bills from ongoing renovations when he discovered a timesheet for Simmons that was not signed by Simmons, but rather by Haley, a member of Local 5, as the "Supervisor."  Clifford Aff., Ex. M. at 1-2.

The timesheet is attached to the charge.  It is a timesheet for Simmons for the week ending April 25, 2008 for 40 "regular hours" and lists the "Department" as the "JATC," i.e., the Fund.  *Id*. at 5.  Clifford then explains in the June 18 Charges that, based on his records and recollection as Apprentice Coordinator of Local 5, Simmons was never employed by the Fund to work on the office renovation.  *Id*.  Clifford alleges that he took particular notice of the timesheet because it had not been signed by Simmons and he then asked the Fund administrator, Irene

23

Weitz, for copies of all payroll checks made out to Simmons. *Id*. Weitz provided a copy of one check, the Simmons Check. The Simmons Check is attached to the June 18 Charges: it is a check made out to Simmons for $957.53 from the account of the Fund[6] for the pay period of April 19 – 25, 2008. *Id*. at 10-11. That is, the Simmons check is for the same period as the timesheet.

The June 18 Charges alleged that Clifford found three issues "troubl[ing]" about the check. First, all Fund checks require two signatures, one from a labor representative of the Fund and one from a management representative of the Fund. However, the Simmons Check was signed by Plaintiff, the Local Union President, and "what appeared to be" Valente, who was not a management representative. Second, Clifford explained that he knew from working with Valente that "he never signs checks as 'Manny Valente'" but rather signs checks as "Manuel A. Valente." Clifford alleged that he showed Valente the Simmons Check and Valente "confirmed that this signature was forged." Third, after speaking to Valente, Clifford reviewed the dates on the timesheet, April 21 – April 25, 2008, and according to his records, Simmons was attending the New Leaders Conference at the National Labor College in Silver Springs, Maryland during that week. *Id*. at 2.

In addition to providing the timesheet and Simmons Check, the June 18 Charges cited and quoted in full five provisions of Code 5 of the IU's disciplinary code that were implicated by the foregoing allegations: (1) Section 1.B ("For any officer of the International or an affiliate knowingly to make a false statement or to conceal a material fact in any official union report, or

---

[6] Plaintiff disputes that the check was drawn on the bank account of the Fund, and not that of Local 5. Pl.'s Resp. 56.1 to IU ¶ 15 ("[T]he June 18 Charges did not allege that the payroll check was written from the Fund's checking account."). Plaintiff is mistaken. The Simmons check clearly indicates that it is a check from "Local 5 New York Apprentice Training & Journeymen Fund," Clifford Aff., Ex. M, which refers to the "Fund" and Plaintiff has not provided information to allow the Court to conclude otherwise.

to withhold information which under the IU Constitution, or laws promulgated thereunder, the officer is required to provide"); (2) Section 1.G ("For any member or affiliate to convert to the member's or affiliate's own use or to the use of another not entitled to such use any property of the International or any affiliate thereof, or to conspire or attempt to do so"); (3) Section 1. M ("For any member or affiliate to interfere with the performance of the legal and contractual obligation of this International, its affiliates, or the officers thereof"); (4) Section 1.S ("For any member or affiliate to commit any act which is seriously detrimental to the interests of the International"); and (5) Section 1.T ("For any member or affiliate knowingly to violate, or to conspire or attempt to violate, the Constitution of the International, any laws promulgated thereunder, or any lawful order of the IU Executive Board.").  *Id*. at 1-2.

Furthermore, the Court notes that Boland's letter to Plaintiff of September 25, 2009 attached as copies to the June 18 Charges:  the Simmons Check, the Simmons timesheet, Simmons' I-9 form, Simmons' W-4 form, an email chain confirming that Simmons was paid for 40 hours from the "A/T fund," and a computer print-out reflecting the payment to Simmons and deductions made therefrom.  Boland Decl. ¶ 3; Boland Decl., Ex. 2; June 18 Charges at 4-12; IU Hearing Dep. 27:9 – 31:4 (Plaintiff confirmed on the record at the hearing that he previously received those documents:  "I mean, I got all that, it[']s all one packet, they sent it to me, the pay stub, his W-4, the time sheets . . . No, we got it all, I have all that.").

### ii.  Analysis

Under the governing legal authority, the June 18 Charges were clearly "specific enough" with regard to the Simmons Check "to inform the accused member of the offense that he has allegedly committed." *Hardeman*, 401 U.S. at 245.  The charges indicate the time and place of

the alleged offense, as they attach the Simmons Check and timesheet, indicate the nature of the charges against Plaintiff, and disclose the identities of the witnesses to the offenses—Clifford, Valente, Simmons and Haley.  IU's Mem. 12.

At his deposition, Plaintiff was unable to articulate *any* reason *why* the June 18 charges were not sufficiently specific as to the Simmons check.  Piacente Dep. 11:12-25 – 12:1-15; *see also* IU's Mem. 10.  Furthermore, at the preliminary injunction hearing, Judge Siebel observed that Plaintiff "seemed to be quite prepared to meet the Simmons allegations," Clifford Aff., Ex. C, 13:17-18; *see also id*. 20:14-22 ("With respect to Mr. Simmons, the transcript of the hearing shows that he was fully prepared to meet that evidence.  He called witnesses . . . He asked before the hearing started for copies of documents and witness statements but he did not ask for further specification of what he was being charged with.").  The Court's review of the record supports Judge Seibel's conclusion.

As discussed by IU, Plaintiff's true argument is that the June 18 Charges failed to *explain how* the alleged facts concerning the Simmons check constitute a violation of the IU Constitution provisions cited in the charges.  IU's Mem. 11.  LMRDA Section 101(a)(5) does not require such an explanation.  As explained by the Ninth Circuit in *Johnson*, "a charge need not apply the underlying facts to the particular constitutional provision or by-law alleged to have been violated . . . Similarly, the charge does not need to allege facts sufficient to support the charge or the particular elements of the charge."  182 F.3d at 1074 n.5; *see also Hardeman*, 401 U.S. at 245 ("Section 101(a)(5) requires no more" than "a detailed statement of the facts relating to the [incident] that formed the basis for the disciplinary action"); *Halsell v. Local Union No. 5, Bricklayers & Allied Craftsmen*, 530 F. Supp. 803, 806 (N.D. Tex. 1982), *aff'd sub nom. Halsell*

*v. Loc Union #5, Bricklayers*, 706 F.2d 313 (5th Cir. 1983) (rejecting plaintiff's contention that

the charge that he had served as an instructor of non-union apprentices "should have spelled out

*just how* his conduct was 'seriously detrimental to the interests of the International,'" the

constitutional provision he was alleged to have violated.) (emphasis added).

The Court also notes that Plaintiff has failed to present any evidence that demonstrates

how the Simmons check charge prejudiced him in his presentation of a defense.  Accordingly,

the Court finds that defendants did not violate Plaintiff's right to be "served with written specific

charges" with respect to the Simmons Check pursuant to Section 101(a)(5)(A) of the LMRDA.

           b.  <u>Full and Fair Hearing on Simmons Check Charge</u>

Plaintiff also alleges that he was not afforded a full and fair hearing on the Simmons

Check charge.  To determine whether Plaintiff was afforded a "full and fair hearing," the Court

"should look to the traditional constitutional concepts of due process," while remaining mindful

that "the member need not necessarily be provided with the full panoply of procedural

safeguards found in criminal proceedings."  *Schermerhorn v. Local 100, Transp. Workers Union

of Am.,* 1995 WL 677092, at *5 (S.D.N.Y. Aug. 17, 1995), *aff'd sub nom. Schermerhorn v. Local

100, Transp. Workers Union of Am., AFL-CIO*, 91 F.3d 316 (2d Cir. 1996) (quoting *Ritz v.

O'Donnell,* 566 F.2d 731, 735 (D.C. Cir. 1977)) (internal quotation marks omitted).

Accordingly, Section 101(a)(5) of the LMRDA "does not require that union disciplinary hearings

incorporate the specific protections associated with judicial proceedings, including the right to be

represented by counsel and the technical rules of pleading, procedure, and evidence."  *United

States v. Int'l Bhd. of Teamsters*, 652 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (quoting *Frye v.

United Steelworkers of Am.,* 767 F.2d 1216, 1224 (7th Cir.), *cert. denied,* 474 U.S. 1007 (1985)).

Courts "should intervene in union disciplinary actions under section 101(a)(5) only if there has been a breach of fundamental fairness." *United States v. Int'l Broth. of Teamsters*, 88 Civ. 4486 (LAP), 2008 WL 2743695 (S.D.N.Y. July 14, 2008) (citations and internal quotation marks omitted). Elements used to establish a full and fair hearing "generally encompass full notice and a reasonable opportunity to be heard—including the right to present evidence and the right to confront and cross-examine witnesses." *Loekle v. Hansen*, 551 F. Supp. 74, 82 (S.D.N.Y. 1982) (citation and internal quotation marks omitted). Finally, the Court notes that "[i]f the charging party, or his counsel, presents witnesses or other evidence at the proceeding, and the respondent is offered both full opportunity to test the validity of that evidence and the opportunity to call the charging persons as witnesses (even as hostile witnesses) . . . , a full and fair hearing is assured." *Ritz,* 566 F.2d at 736.

Here, Plaintiff received a copy of the June 18 Charges before September 25, 2009, the charge was read into the record at the disciplinary hearing, and the parties were informed regarding the hearing procedure and their rights. IU's Mem. 15 (citing IU Hearing Tr. 3:6 – 8:5, 10:10 – 12:15). Afterward, Plaintiff made an opening statement at the hearing, was permitted to call witnesses on his own behalf to testify at the hearing, and Plaintiff did in fact call Simmons, Haley, and the charging party, Clifford, as an adverse witness. *Id.* (citing IU Hearing Tr. 20:22 – 22:24, 101:16 – 106:6, 115:24 – 125:6, 128:15 – 129:14, 137:3 – 142:24; *see also* Piacente Dep. 16:11-22, 23:10 – 24:9). Plaintiff was also permitted, but declined, to testify in his own defense; however, Plaintiff made numerous statements on the record in his own defense, often in the middle of questioning witnesses, thereby avoiding being subject to cross-examination on such statements. *Id.* (citing IU Hearing Tr. 11:13-16, 53:9 – 55:12, 61:7-23, 64:12-17, 70:15 – 71:5,

72:2 – 73:5, 74:16-24, 75:3-25, 77:19 – 78:7, 83:21-24, 84:20 – 85:9, 105:10-17, 141:20-142:9,

136-16-20; *see also* Piacente Dep. 23:16-17; Notice to Admit, Q. 31).  Plaintiff was also

permitted to, and did, confront and cross-examine witnesses called by the charging party at the

hearing, specifically Clifford and Valente.  *Id*. at 15-16.  In addition, Plaintiff introduced

documentary evidence on his own behalf, *id*. at 16 (citing IU Hearing Tr. 104:7-10, 152:19 –

154:12; Piacente Dep. 23:18-25), and made a closing argument.  Id. (IU Hearing Tr. 143:1 –

152:16).  Finally, in his deposition testimony, when asked why he was denied a full and fair

hearing on the Simmons check charge, Plaintiff simply stated that the charge was "not a true

charge.  The charge itself was a bogus charge."  Piacente Dep. 26:14-15; *see generally id*. 25:21

– 26:24.  The Court finds that Plaintiff was afforded with due process required to assure a "full

and fair hearing" on the Simmons check charge.

　　　　In his opposition papers, Plaintiff argues that Clifford "fail[ed] to present relevant

documentation to the IU (for example, the collection of timesheets that would show that Mr.

Haley signed everyone's timesheets, and that he submitted timesheets for [Fund] instructors as

well as construction workers)."  Pl.'s Opp. Mem. 8.  However, Plaintiff fails to put forth any

evidence to show how the failure to provide these timesheets denied him a fair hearing.  *See* IU

Reply Mem. 6.  Furthermore, the IU notes that Plaintiff himself presented Haley as a witness at

the hearing and elicited testimony that he, Haley, filled out timesheets for all of the workers

employed to perform the renovation of the Fund's offices and therefore that evidence was

already in the record.  *Id*. (citing IU Hearing Tr. 115:24 – 117:25).

　　　　Plaintiff also complains that some witnesses at the hearing were sworn and others were

not.  Compl. ¶¶ 37, 44.  However, the failure to swear witnesses at a disciplinary hearing does

not deny the charged party a full and fair hearing where the complaining party, as here, can show

no prejudice resulting therefrom. *Mandaglio v. United Bhd. of Carpenters & Joiners of Am.*

*(Gen. Executive Bd.)*, 575 F. Supp. 646, 653 (E.D.N.Y. 1983) (finding that plaintiffs had failed to

show prejudice from disciplinary committee's refusal to swear witnesses); *see also* IU Mem. 16.

Relatedly, although Plaintiff complains that he was not permitted pre-hearing discovery of

"copies of all the evidence, documents and the substance of any witness testimony that would be

introduced at the hearing," Compl. ¶¶ 30-32, 36, 38, 43, charged parties have no right under

Section 101(a)(5) to pre-hearing discovery of documents or other evidence "material to the proof

of the allegations against them." *Georgopoulos*, 942 F. Supp. at 897 (S.D.N.Y. 1996) (there is

"no Second Circuit case law that supports plaintiffs' claim that "[a] union must provide accused

members with documents which are material to the proof of the allegations against them.").

Nevertheless, Plaintiff here *was* provided with documents relevant to the Simmons check charge,

discussed above, well in advance of the hearing.

Finally, Plaintiff complains that the Simmons Check charge "indicate[s], in this respect,

what was true:  everyone knew that Simmons was going to [the New Leader] training."  Pl.'s

Opp. Mem. 9.  However, as correctly noted by IU, this argument goes to the *substance* of the

hearing and not to the *process* by which it was conducted.  IU's Reply Mem. 6.  Accordingly,

Defendant IU's motion for summary judgment to dismiss the Simmons Check claim is

GRANTED.

### c.  25 Additional Checks

IU seeks summary judgment on the charge concerning the twenty-five additional Fund

checks because Plaintiff was not disciplined on that charge within the meaning of Section

101(a)(5).  IU's Mem. 22.  Section 101(a)(5) provides that no member of a labor organization

can be "fined, suspended, expelled, *or otherwise disciplined*," absent certain procedural

protections.  29 U.S.C. § 411(a)(5) (emphasis added).  Here, the IU Executive Board noted:

> There is no allegation that the additional 25 [Fund] checks were for improper
> expenditures, and on the contrary, the testimony adduced at the hearing seems to
> indicate that the checks were for proper purposes.  Thus, the issue is the manner
> of executing the checks rather than whether the expenditures were reasonable or
> authorized.  We certainly cannot and do not condone forgoing signatures.  We
> encourage our local unions to employ financial safeguards for both local union
> finances and in dealing with related funds, including using dual signatures on
> checks.  Having said that however, the remedy for this offense would be to bar the
> charged party from office.  Because that remedy is fully supported by the
> violations above, nothing would be served by 'piling on" through this charge, and
> we therefore *decline to rule on this charge*.

Defs.' Notice to Admit, Ex. I at 8 (emphasis added).  Plaintiff in opposition does not contest the

facts, but rather argues that the IU's decision was circulated to the general union membership

and "clearly condemned Mr. Piacente and further stigmatized him."  Pl.'s Opp. Mem. 10, 10 n.6.

Since Plaintiff does not allege that he was "fined, suspended, [or] expelled," his only

argument could be that he was "otherwise disciplined" under the LMDRA.  "What constitutes

'discipline' is a question of law."  *Schermerhorn*, 1995 WL 677092, at *7 (citing *Galke v. Duffy*,

645 F.2d 118, 120 (2d Cir. 1981); *Morrissey v. National Maritime Union*, 544 F.2d 19, 25-26 (2d

Cir. 1976); *Camporeale v. Airborne Freight Corp.*, 732 F. Supp. 358, 365 (E.D.N.Y.), *aff'd*, 923

F.2d 842 (2d Cir. 1990)).  The Second Circuit has described the term "discipline" in the LMRDA

as referring to an "an act of self-protection . . . taken by the union in the interest of promoting the

welfare of the group is entitled to these guarantees.  *Schermerhorn*, 1995 WL 677092, at *8

(quoting *Detroy v. Am. Guild of Variety Artists*, 286 F.2d 75, 81 (2d Cir. 1961)) (internal

quotation marks omitted).  The Court has also described "discipline" as action which "typically

involves official union conduct that has the purpose and effect of punishing a member." *Galke,* 645 F.2d at 120 (declining to find that reclassification of a union member's seniority status was "discipline" because the action was administrative, not punitive, in nature and because "it would be onerous to require a union to conduct a full and fair hearing . . . whenever it discovers that certain information submitted by an employee seeking to change his seniority date is incorrect."). Blacklisting of a union representative or issuing formal reprimands may constitute "discipline." *See Detroy*, 286 F.2d at 81 (holding that the blacklisting of a union member who refused to abide by an arbitration award in violation of a contract between union members and employers constituted "discipline" under the LMRDA); *Schermerhorn,* 91 F.3d at 326 (holding that formal reprimands constituted actionable discipline within the meaning of § 411(a)(5)).

However, the situation here, where Plaintiff was not punished, blacklisted, or otherwise reprimanded does not meet the threshold for "discipline." *See Perales Vara v. Laborers' Int'l Union of N. Am., Local 89*, 662 F. Supp. 492, 495 (S.D. Cal. 1987) (finding that plaintiff's assertions that a disciplinary decision which contained findings of fact which were critical of his conduct were without merit because "an implied or indirect reprimand or censure" is a "mere 'slap on the wrist' " which "cannot be raised to the level of a 'fine, suspension or expulsion' or an action of similar severity embraced by the 'otherwise discipline' proviso.") (quoting *Rekant v. Shochtay-Gasos Local 466, Meatcutters,* 320 F.2d 271, 277 (3d Cir. 1963)); *Dessler v. Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 251*, 686 F. Supp. 977, 982 (D.R.I. 1988) (finding that "censure" of plaintiff was insufficient did not constitute discipline within the LMRDA).  Accordingly, IU's statements made in the course of finding the

charged party *not liable* on a charge do not constitute "discipline" within the meaning of Section 101(a)(5).[7]  Summary judgment is thus granted with respect to the 25 additional checks.

### d.  Vending Machine Charge

IU seeks summary judgment on the charge concerning the vending machine alleging that the discipline imposed on this charge is merely duplicative of that imposed for the Simmons check.  IU's Mem. L. 9.  The only discipline that the IU Executive Board imposed on the vending machine charge was to bar Plaintiff "from seeking or holding union office or position for a period of five (5) years, to run concurrently with the five year bar resulting from the Simmons Check charge . . . ."  Defs.' Notice to Admit, Ex. I at 7-8.  IU argues that the vending machine charge is non-justiciable because there will be no case or controversy between the parties as to that charge, "but merely a hypothetical question seeking an advisory opinion."  IU's Mem. 24.  IU further claims that if the IU's Executive Board's determination on the Simmons Check charge is upheld, the Court would not be able to grant Plaintiff relief on the vending machine charge—overturning the five year ban on Plaintiff seeking or holding union office or

---

[7] Plaintiff, as his sole legal authority, relies on *Galke* wherein the Second Circuit held that Plaintiff was not disciplined under the LMRDA where his seniority status was changed from an earlier to a later seniority date. Plaintiff relies on *dicta* in *Galke* stating that "no stigma attaches to reclassification" of seniority status and that "Galke was not stigmatized or separated from comparable members in good standing" by the reclassification. *Galke,* 645 F.2d at 120; Pl.'s Opp. Mem. L. 9-10.  However, *Galke* merely indicated that the seniority reclassification did not affect the plaintiff's membership rights in the union and that he was "not stigmatized or separated from comparable members in good standing."  *Galke,* 645 F.2d at 120.  Plaintiff's accusation of general social stigma was not at issue in *Galke*.

Furthermore, as noted by IU, "under Plaintiff's argument, any union member subject to internal union charges could obtain judicial review under Section 101(a)(5) of any statement in the union's decision on the charges that arguable reflects negatively on him or her – even where the decision finds the charged party not liable – simply by the alleging that he or she was 'stigmatized' thereby."  IU's Reply Mem. 8.

Finally, Plaintiff fails to explain what, if any, social stigma he may have faced as a result of the IU Executive Board's decision on the 25 checks charge.

position—even if it were to conclude that the IU Executive Board's determination on that charge did not comply with LMRDA Section 101(a)(5).  *Id.*

In order to assert Article III jurisdiction under the United States Constitution, a court must have before it a live case or controversy.  *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3 (1964).  "Federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  *North Carolina v. Rice,* 404 U.S. 244, 246 (1971).  A suit "must be a real and substantial controversy admitting of specific relief through a decree of conclusive character."  *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41 (1937).

Here, Plaintiff has sought several types of relief:  monetary damages, attorneys' fees and injunctive relief.  Compl. p. 11.  The LMRDA provides for monetary damages.  29 U.S.C. § 412 ("Any person whose rights secured by the provisions of this subchapter have been infringed by any violations of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.");  *Kinslow v. American Postal Workers Union, Chi. Local,* 222 F.3d 269, 277-78 (7th Cir. 2000) (discussing damages available under the LMRDA).  Therefore, if the Court finds in favor of Plaintiff on the vending machine charge, although it cannot overturn the five year ban on the Simmons check charge, "there is no question that [Plaintiff's] claim for monetary damages survives and is not moot."  *Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 378-88 (3d Cir. 1999) (finding that a LMRDA claim for retaliatory removal from position and requesting monetary damages was not rendered moot following a plaintiff union treasurer's reinstatement);  *see also Chavis v. Rowe,* 643 F.2d 1281, 1287-88 (7th Cir. 1981) (in the prisoner context, due process claim not mooted upon vacation of decision violating due process where plaintiff was still entitled to damages);

34

*D'Amico v. Bldg. Material Lumberbox, Shaving, Roofing & Insulating Chauffeurs, Teamsters, Warehousemen & Helpers*, 02 Civ. 0120, 2005 WL 483436, at *6 (N.D. Ill. Mar. 1, 2005) ("Unless and until it becomes clear that the Court can provide no relief to plaintiffs, their claims are not moot."). The Court need not decide at this stage what types of relief might be available to Plaintiff. However, it is clear that Plaintiff may be entitled to relief that is not strictly limited to overturning the suspension charge on the vending machine. Accordingly, IU's motion for summary judgment to dismiss the vending machine charge is DENIED.[8]

### IV.   Defendants Local 5, Clifford and Valente's Motion for Partial Summary Judgment

Defendants Local 5, Clifford and Valente have moved for summary judgment on Plaintiff's sole claim for violation of Section 101(a)(5), alleging that Local 5, Clifford and Valente are improper parties to this action. Furthermore, they seek partial summary judgment on their six counterclaims against Plaintiff. However, they do not seek summary judgment on the counterclaims premised, in part, on the purported improper purchase and conversion of the computer due to anticipated factual issues. Local 5 Reply Mem. 8 n. 13.

---

[8] Plaintiff in his opposition papers alleges that the December 14, 2008 charges, which included the vending machine charge, were insufficiently specific and failed to comply with the specificity requirements of LMRDA Section 101(a)(5) (discussed above in []). Pl.'s Opp. Mem. L. 7. IU did not address this claim in either of its briefs. However, as the Court has denied IU's motion for summary judgment on the vending machine charge, the Court need not decide this issue at this point in time.

Additionally, although not discussed by either party, the Court notes that Plaintiff's vending machine claim may be moot. In *Helmer v. Briody*, 759 F. Supp. 170 (S.D.N.Y. 1991), the court noted that plaintiff's claim that his conviction and removal from union office violated Section 101(a)(5) was foreclosed because Section 101(a)(5)'s safeguards apply "only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union.*'" 759 F. Supp. at 179 (quoting *Finnegan v. Leu*, 456 U.S. 431, 438 (1982)) (emphasis in original). However, as the parties have not addressed this issue, the Court declines to rule on the vending machine charge on this basis.

a. **Liability of the Individual Defendants (Clifford & Valente) and Local 5**

Clifford and Valente argue that Plaintiff's claims against them must be dismissed because (1) they are not sued in their capacities as officers of Local 5, but rather are sued in their individual capacities and as trustees of the several funds of Local 5; and (2) that Clifford and Valente did not fine, suspend, expel or otherwise discipline Plaintiff under the LMRDA.  Local 5 Mem.  6.

The LMRDA "does not create a right to sue union officers for torts committed by them in their private capacities." *Berg v. Watson*, 417 F. Supp. 806, 812 (S.D.N.Y. 1976) (collecting cases).  Accordingly, to the extent Plaintiff's allegations against Clifford and Valente are "predicated upon private conduct constituting a tort, such a claim is not cognizable under the Act." *Cole v. Hall*, 35 F.R.D. 4, 7 (E.D.N.Y. 1964), *aff'd*, 339 F.2d 881 (2d Cir. 1965) (citing *Tomko v. Hilbert*, 288 F.2d 625, 629 (3d Cir. 1961) ("Private misconduct which incidentally may frustrate appellant's rights as a union member does not give rise to an action under the bill-of-rights section").

Clifford and Valente also argue that they are not liable in their capacities as trustees of the several funds of Local 5.  They rely on the Second Circuit's decision in  *National Labor Relations Board v. Truck Drivers Local Union No. 449,* 728 F.2d 80 (1984) for the proposition that "pension fund trustees acting within their authority cannot, as a matter of law, be considered union agents."  Local 5 Mem. 7-8 (citing *N.L.R.B.,* 728 F.2d at 87).  However, the court in *N.L.R.B.* expressly left open the question of whether pension trustees could ever act as union agents and noted that actions by trustees might be attributed to the union if the "trustees' acts were undertaken in their capacities as union officials rather than as trustees." *N.L.R.B.,* 728 F.2d

at 88-89 (citation omitted).  The parties here dispute whether Clifford and Valente's actions against Plaintiff were taken in their capacities as union officials, and therefore, the Court declines to reach the merits of Clifford and Valente's trustee claim at this juncture.

The parties' main contention is whether Clifford and Valente were properly named as union officials or agents in the Complaint.  Local 5 Mem. 7; Pl.'s Opp. Mem. 12-13.  The LMRDA provides a civil remedy against union officials "where, acting under color of and in abuse of their authority as union officers, they violate the protected rights of union members." *Berg v. Watson*, 417 F. Supp. 806, 812 (S.D.N.Y. 1976); *see also Tomko*, 288 F.2d at 625-26 (finding that the LMRDA provides a civil remedy "for the vindication of rights contained in the bill of rights" against someone who "is . . . acting in the capacity of an official or agent of a labor union.").  Defendants note that in the caption of the Complaint, Clifford and Valente are named "individually," in their capacities as "member[s]" of Local 5, and as trustees of the several funds of Local 5.  Compl., p. 1 (caption).  Therefore, Clifford and Valente allege that they are not properly named as officials of Local 5.  Local 5 Mem. 7 n.1.

However, the Court does not read the Complaint to be as clear cut as Defendants assert. When discussing Clifford, the Complaint states that at all relevant times, Clifford "was employed by the Local [5] and is [] presently its Secretary-Treasurer . . . [Clifford] is sued individually and in his official capacity."  Compl. ¶ 10.  With regard to Valente, the Complaint states that at all relevant times, Valente "was employed by the Local [5] and is its current President . . . [Valente] is sued individually and in his official capacity."  *Id*. ¶ 11.  Moreover, the June 18 Charges appear to have been filed by Clifford as Secretary-Treasurer of Local 5, Clifford Aff., Ex. M at 1-3, and at the IU Hearing, Clifford testified that he uncovered the Simmons check in his

capacity as an official of Local 5.  IU Hearing Tr. 14-20 (when discussing how he learned about

the Simmons check, Clifford stated:  "I would like to explain how I came about, in May of 2009,

in my capacity as secretary treasurer of BAC Local 5.").

 Clifford and Valente further argue that they did not fine, suspend, expel or otherwise

discipline Plaintiff under Section 101(a)(5).  Local 5 Mem. 7.  "[T]o support a private action

against a union official for violation of LMRDA § 101, the plaintiff must show that the union

official 'aided, abet[ted], instigate[d], or direct[ed] a wrongful use of union power to deprive a

member of his rights.'"  *Commer v. McEntee*, 00 Civ. 7913 (RWS), 2006 WL 3262494, at *10

(S.D.N.Y. Nov. 9, 2006) (quoting *Rosario v. Amalgamated Ladies' Garment Cutters' Union,* 605

F.2d 1228, 1246 (2d Cir. 1979)).  Here, as in *Berg*, "[w]ithout a detailed review of plaintiff's

assertions regarding the motivations behind the individual defendants' actions in this matter, it

can easily be seen that the question [of Clifford and Valente's role] is fraught with contested

issues of material fact."  *Berg*, 417 F. Supp. at 812.  Plaintiff alleges that Clifford and Valente

are liable because they abused their authority by scheming to bring charges against Plaintiff and

were motivated by their animus against him.  *See* Pl.'s Opp. Mem. 12-13; Piacente Aff. ¶¶ 20,

23-24.  Although the Court is not convinced that Plaintiff will ultimately prevail at trial on his

claims against Clifford and Valente, disputed issues of material fact preclude the entry of

summary judgment in their favor at this time. Accordingly, their motion on the charges against

them in their individual and official capacities is denied.

 Local 5 also moves for dismissal of Plaintiff's claims against it claiming that it did not

fine, suspend, expel or otherwise discipline Plaintiff.  Local 5 Mem. 5.  In order for Plaintiff to

succeed in his claims against Local 5, he must show either that Local 5 was an agent of the IU or

that Local 5 "instigated, supported, ratified or encouraged" the IU's alleged unlawful conduct. *Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union of N. Am.*, 624 F. Supp. 678, 684 (S.D.N.Y. 1985) (quoting *Boss v. International Brotherhood of Boilermakers,* 567 F.S upp. 845, 848 (N.D.N.Y. 1983), *aff'd mem.,* 742 F.2d 1446 (1983)) (internal quotation marks omitted). Local 5 argues that the discipline issued against Plaintiff was presented by the IU, and not Local 5, *id.*, and that Plaintiff has failed to provide evidence that Local 5's management committee sanctioned Plaintiff's prosecution. Local 5 Reply Mem. 2. Local 5 provides no legal authority for its position. Nevertheless, as Clifford appears to have filed the June 18 Charges as a representative of Local 5 and submitted the charges to the IU for investigation, there are issues of material fact precluding summary judgment in favor of Local 5.

### b.  **Defendants' Counterclaims**

In their First and Second Counterclaims, Clifford and Valente, as fiduciaries of the Fund, seek relief under Section 502(a)(2) of the ERISA, 29 U.S.C. § 1132(a)(2), against Plaintiff for various alleged breaches of his fiduciary duties. Counterclaims ¶¶ 5-6, 21-29, Doc. 15. "The obligation of trustees of an employee benefit plan in investing a plan's assets is analyzed under common law principles of trusts "bearing in mind the special nature and purpose of employee benefit plans," *Katsaros v. Cody*, 568 F. Supp. 360, 366 (E.D.N.Y. 1983), *aff'd*, 744 F.2d 270 (2d Cir. 1984), and the duties of a trustee are "the highest known to law." *Id.* (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied,* 459 U.S. 1069 (1982)).

To state a claim for breach of fiduciary duty under ERISA, Plaintiffs must plead "(1) that defendant was a fiduciary who, (2) was acting within his capacity as a fiduciary, and (3) breached his fiduciary duty." *Bd. of Trustees of Aftra Retirement Fund v. JPMorgan Chase*

*Bank, N.A.,* 806 F. Supp. 2d 662, 679 (S.D.N.Y. 2011) (quoting *SCS Commc'ns, Inc. v. Herrick Co.,* 360 F.3d 329, 342 (2d Cir. 2004)).  A person is a fiduciary under ERISA to the extent he exercises any discretionary authority or control over fund assets, ERISA § 3(21), 29 U.S.C. § 1002(21), and an ERISA fund trustee "shall have exclusive authority and discretion to manage and control assets" of the fund.  ERISA § 403(a), 29 U.S.C. § 1103(a).  Plaintiff here admits that he "had discretion with respect to the operation of the Fund, and, with others, had control over Fund assets," and that he was "a fiduciary with respect to the Fund within the meaning of ERISA."  Pl.'s Reply to Counterclaims ¶ 3, Doc. 17.

In their First and Second Counterclaims, Clifford and Valente allege that Plaintiff:  (1) failed to administer the Fund assets in accordance with the Trust Agreement, as required under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D); (2) failed to discharge his duties with respect to the Fund solely in the interest of the Fund participants as required under ERISA § 404(a)(1)(A); and (3) transferred value from the Fund to a party in interest.  ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

### i. Plaintiff Violated the Trust Agreement By Executing Checks with Two Union Trustee Signatures and No Employer Trustee Signature

As a fiduciary of the Fund, Plaintiff was required to discharge his duties "in accordance with the documents and instruments governing the plan."  ERISA § 404(a)(1)(D); *see Herman v. Time Warner Inc.*, 56 F. Supp. 2d 411, 416 (S.D.N.Y. 1999) (collecting cases).  Here, as discussed above, Plaintiff was one of the signatories of the Fund's Trust Agreement ("Trust Agreement").  The Trust Agreement set forth the purposes, powers, rights, duties and obligations of the Fund and its trustees.  Pursuant to Article III, Section 7 of the Trust Agreement:

> [A]ll checks, drafts, vouchers, or other withdrawals of funds from the accounts or account of the Trust Estate shall be signed by one Employer Trustee and one Union Trustee.  The Trustees may designate, in writing, two or more Trustees to sign said withdrawals provided that any two such designated Trustees who actually sign checks are not both members of the Employers or Union group.  The Trustees may by resolution authorize the Fund Manager and/or Agent or other Employees of the Fund to be the sole signatory on checks drawn on an office account.

Clifford Decl., Ex. O ("Trust Agreement").  Accordingly, the Trust Agreement contained two separate but related requirements with respect to all checks:  (1) that every check be signed by "one Employer Trustee and one Union Trustee;" and (2) the related, but additional, mandate that no check be executed by two signatories who are "both members of the Employers or Union group."  According to Clifford and Valente, such provisions forbade Plaintiff from issuing checks from the Fund account without Trustees appointed by both joint sponsors—union and employers—authorizing those expenditures.  Local 5 Mem. 10-11.

Plaintiff has admitted that with respect to the Simmons Check he signed in this own name and also signed the name of Valente, another union trustee.  *Id.*; *see* Pl.'s Resp. 56.1 to Local 5 ¶ 17.  Likewise, Plaintiff has also admitted that he signed 25 additional checks from the Fund account in his own name and in the name of Valente.  Therefore, according to Clifford and Valente, Plaintiff violated the Trust Agreement's requirements that every check "shall be signed by one Employer Trustee and one Union Trustee" and that no check be executed by two signatories who are "both members of the Employers or Union group."  See Local 5 Mem. 11.

In support of their argument, Clifford and Valente rely on the Second Circuit's decision *Dardaganis v. Grace Capital Inc.,* 889 F.2d 1237 (2d Cir. 1989).  Local 5 Mem. 11-13.  In *Dardaganis*, the Trustees of the Retirement Fund of the Fur Manufacturing Industry entered into

41

an agreement with Grace Capital, Inc., in which Grace became investment manager of the assets of the retirement fund and promised to "manage the [Fund's] Account in strict conformity with the investment guidelines promulgated by the Trustees." *Id.* at 1239.   Pursuant to the investment guidelines, Grace was prohibited from investing more than fifty percent of fund assets in common stocks.   During an eight month period, however, Grace invested more than fifty percent of fund assets in common stock, exceeding the fifty percent ceiling each month by an average of fifteen percent.   The Trustees refused to increase the ceiling above fifty percent, and Grace was fired when the common stock holdings increased to approximately eighty percent of the portfolio.   The Trustees then sued, alleging that Grace had breached a fiduciary duty embodied in 29 U.S.C. § 1104(a)(1)(D), by failing to adhere to investment guidelines.   The district court granted the Trustees' motion for partial summary judgment on the issue of liability, holding that Section 1104's requirement that fiduciaries abide by the plan documents together with the agreement's provision that Grace manage the fund "in strict conformity with the investment guidelines," required the court to conclude, as a matter of law, that "[a]ny violation of the terms of [the] [a]greement constitute[d] a breach of Grace Capital's fiduciary duty under § 1104(a)(1)(D) and create[d] liability to the Fund." *Dardaganis,* 889 F.2d at 1239.

On appeal, the Second Circuit rejected defendant's argument that the Trustees' awareness that GCI had exceeded the 50% limit without voicing objection raised a factual issue precluding summary judgment.   The court explained that "[t]o the extent that plan trustees are negligent in enforcing the rights of beneficiaries, they might be subject to separate suit by those beneficiaries or, perhaps, to suit by co-fiduciaries for indemnification or contribution." *Id.* at 1241.   However,

42

the court also noted that such potential actions against trustees would not prevent them from suing on behalf of the plan for losses caused by the actions of the other fiduciaries. *Id.*

Furthermore, and most relevant to the argument in this case, the court also rejected GCI's argument that the issue of breach of Section 1104(a)(1) should be evaluated under an "overall prudence standard." *Id.* The court explained:

> This argument ignores the independent significance of the subdivisions of section 1104(a)(1). Subdivision (B) of section 1104(a)(1) imposes a general duty to act with 'care, skill, prudence, and diligence.' 29 U.S.C. § 1104(a)(1)(B). Under GCI's interpretation, this duty to act with prudence would be the only duty imposed by subsection 1104(a)(1). *But subdivisions (A), (C), and (D) impose more specific duties*, *such as* acting for the exclusive purpose of providing benefits to participants and beneficiaries, *id.* § 1104(a)(1)(A), acting so as to diversify plan investments in order to minimize risk, *id.* § 1104(a)(1)(C), and *acting in accordance with plan documents*, *id.* § 1104(a)(1)(D). A fiduciary's failure to meet these specific requirements of section 1104(a)(1) is not merely evidence of imprudent action but may, in itself, be a basis for liability under section 1109. (citations omitted).

*Id.* at 1241-42 (emphasis added). Finally, the court noted that although GCI attempted to persuade the district court its investment decisions were prudent, it made no showing that it would have been imprudent to comply with the fifty percent ceiling or that such compliance would have required it to breach an ERISA provision separate and apart from that of Section 1104(a)(1)(D). *Id.* at 1242. Relying on *Dardaganis*, Clifford and Valente argue that Plaintiff cannot preclude summary judgment by arguing that there is a dispute of fact as to whether the improperly signed checks were otherwise reasonable or prudent, "because reasonableness or prudence is no justification for failure to follow the explicit language of the Trust Agreement." Local 5 Mem. 13.

Plaintiff in opposition admits to "not following the letter of the Trust [A]greement," Pl.'s Opp. Mem. 25, but claims that the Trust Agreement gave the trustees "discretion" to act to suit

the needs of the Fund.  Pl.'s Opp. Mem. 21.  Plaintiff cites the following Trust Agreement

provisions in support of his argument:

> Section 11
>
> (d)  The Trustees may freely act under all or any of the powers under this Agreement and
> Declaration of Trust after forming their judgment, based upon all of the circumstances of
> any particular situation as to the wisest and best course to pursue in the interest of this
> Trust and the beneficiaries hereunder, without the necessity of obtaining the consent or
> permission of any person interested therein[.]

However, as counter-claim plaintiffs point out, that provision does not trump the clear

directive of § 1104(a)(1)(D) to act "in accordance with the documents and instruments governing

the plan," and the Second Circuit's guidance in *Dardaganis*.  889 F.2d at 124 (finding that a

fiduciary's failure to meet the specific requirements of §1104(a)(1) may be a basis for liability

under § 1109).  Accordingly, there being no dispute that Piacente violated the express provisions

of Article III, Section 7 of the Trust Agreement, or that Fund assets were used to sponsor

Simmon's participation in training that Local 5 should have paid for, liability is established and

only the question of damages, if any, remains for trial.  Summary judgment is thus granted on the

First and Second Counterclaims.

ii.  <u>Local 5 has No Standing to Sue Under the LMRDA</u>

The Third Counterclaim is brought by Local 5 only and is premised on Piacente's breach

of fiduciary duty in violation of § 501(a) of the LMRDA.  Piacente, relying on two district court

decisions in this district, argues that *unions*, as distinguished from union *members*, may not

maintain actions for breach of fiduciary duty under the LMRDA.  *See Dunlop-McCullen v.

Pascarella*, 97 Civ. 0195, 2002 WL 31521012 *9  (Nov. 13, 2002, S.D.N.Y.); *United

Transportation Union v. Bottalico*, 120 F.Supp.2d 407, 409 (S.D.N.Y. 2000).  However, while

44

Piacente raises the issue, neither party engages in an analysis of it.  Regardless, the Court has

examined the issue, agrees with Piacente, and dismisses the Third Counterclaim *sua sponte.*

Section 501(a) of the LMRDA imposes particular fiduciary duties on union officials

because "[t]he officers, agents, shop stewards, and other representatives of a labor organization

occupy positions of trust in relation to such organization and its members as a group."  29 U.S.C.

§ 501(a).  Section 501(b) prescribes the remedy for a breach of these duties, stating in relevant

part:

> When any officer, agent, shop steward, or representative of any labor organization is
> alleged to have violated the duties declared in subsection (a) of this section and the labor
> organization or its governing board or officers refuse or fail to sue or recover damages or
> secure an accounting or other appropriate relief within a reasonable time after being
> requested to do so by any member of the labor organization, such member may sue such
> officer, agent, shop steward, or representative in any district court of the United States or
> in any State court of competent jurisdiction to recover damages or secure an accounting
> or other appropriate relief for the benefit of the labor organization. No such proceeding
> shall be brought except upon leave of the court obtained upon verified application and for
> good cause shown, which application may be made ex parte.

29 U.S.C § 501(b)

By its terms, § 501(b) clearly creates a federal cause of action for an individual union

member to file suit when certain procedural hurdles are met.  Section 501(b) is silent, however,

as to whether it creates a federal cause of action for a union to sue on its own behalf.  Courts

considering the issue have reached inconsistent conclusions.  *See Guidry v. Sheet Metal Workers*

*Nat'l Pension Fund*, 493 U.S. 365, 374 n. 16 (1990) (recognizing that courts have reached

inconsistent positions on whether § 501 creates an implied federal cause of action for unions but

declining to resolve the issue).    The Seventh and Eleventh Circuits have held that § 501(a)

creates an implied cause of action for unions to sue on their own behalf.   *Int'l Union of*

*Operating Eng'rs, Local 150 v. Ward*, 563 F.3d 276, 282–89 (7th Cir.2009); *Int'l Union of Elec.,*

*Elec., Salaried, Mach. & Furniture Workers v. Statham*, 97 F.3d 1416, 1418–21 (11th Cir.1996).

The Ninth Circuit, however, has held that § 501(b) creates no such right.  *Bldg. Material &*

*Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 506–07 (9th Cir.1989). The Second

Circuit has yet to address the issue.  More recently, the district court for the District of Columbia

issued a decision aligning itself with the view that § 501(a) does not create an implied cause of

action for unions, which is currently under appeal.  *See International Union, Security, Police and*

*Fire Professionals of America v. Faye*, 09 Civ. 2229 (RJL), 2015 WL 4450119, (July 20 2015,

D.D.C.).

After reviewing the existing case law, this Court finds that Judge Mukasey's analysis in

*Bottalico* to be the most cogent.  See *Bottalico*, 120 F.Supp.2d at 408-09 (explaining that where a

statute expressly provides a remedy, as § 501(a) expressly does, courts must be especially

reluctant to provide additional remedies).  Accordingly, I find that this Court does not have

subject matter jurisdiction over the Third Counterclaim, and the same is hereby dismissed.  *See*

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (the issue of a court's subject matter

jurisdiction "may be raised by a party, or by the court on its own initiative, at any stage in the

litigation, even after trial and the entry of judgment.")  If a district court "determines *at any time*

that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P.

12(h)(3) (emphasis added).

### iii.  Fact Issues Preclude Summary Judgment on Local 5's Remaining Claims

Counterclaims Four, Five and Six are also brought by Local 5 only and are premised on

violations of New York State law—breach of fiduciary duty, replevin and conversion,

respectively.  This Court may exercise subject matter jurisdiction over these claims pursuant to

its supplemental jurisdiction.  *See* 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]")

The factual bases for these Counterclaims relate to Piacente's purported conversion of the computer, the vending machine proceeds, and the Local 5's books and records.  The parties agree that the circumstances surrounding the purchase of the computer raise issues of fact which preclude summary judgment.  The Court finds that factual issues similarly preclude summary judgment with respect to the vending machine proceeds and the books and records.  Piacente has specifically denied taking vending machine proceeds or retaining any Local 5 documents that are not mere copies.  Counterclaim Plaintiff Local 5 has not established the absence of genuine issues of material fact such that it should be entitled to judgment as a matter of law. Accordingly, Local 5's motion for summary judgment on Counterclaims Four, Five and Six is denied.

### V.    Conclusion

For the reasons set forth above, Defendants' Motions for Summary Judgment are GRANTED in part and DENIED in part.  Specifically, the Court

GRANTS Defendants summary judgment on the charges concerning:  (1) the Simmons Check, and (2) the 25 additional checks;

DENIES Defendants summary judgment on the charge concerning the vending machine proceeds;

GRANTS Counterclaim Plaintiffs' (Valente and Clifford) summary judgment on the First and Second Counterclaims;

DISMISSES, *sua sponte*, Counterclaim Plaintiff's (Local 5) Third Counterclaim; and

DENIES Counterclaim Plaintiff's (Local 5) summary judgment on the Fourth, Fifth and Sixth Counterclaims.

Accordingly, remaining for trial are: (1) Plaintiff's allegations concerning the computer and vending machine proceeds; (2) the issue of damages *only* with respect to the First and Second Counterclaims; and (3) the Fourth, Fifth and Sixth Counterclaims. The parties are directed to appear for a pretrial conference on **October 22, 2015 at 10:30 a.m.**, at which time a final pretrial conference date and trial date will be set. The conference will be held in **Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.**

The Clerk of Court is respectfully directed to terminate the pending motions, Docs. 27 and 31.

It is SO ORDERED.

Dated: September 30, 2015
New York, New York

Edgardo Ramos, U.S.D.J.

48